# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WILLIAM BALLOU and JOAN WILLIAMSON, | Case No. 0:21-cv-00694-SRN-ECW |
| Plaintiffs, | Judge Susan Richard Nelson |
| v. | Magistrate Judge Elizabeth Cowan Wright |
| ASSET MARKETING SERVICES, LLC, d/b/a GOVMINT.COM, | **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF CONSOLIDATED MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** |
| Defendant. | |
| WILLIAM CULVER | Case No. 0:21-cv-01237-SRN-ECW |
| Plaintiff, | Judge Susan Richard Nelson |
| v. | Magistrate Judge Elizabeth Cowan Wright |
| ASSET MARKETING SERVICES, LLC, d/b/a GOVMINT.COM, | |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiffs William Ballou ("Ballou"), Joan Williamson ("Williamson"), and William Culver ("Culver") are former customers of Defendant Asset Marketing Services, LLC, *d/b/a* GovMint.com ("AMS" or the "Company"). Plaintiffs repeatedly acknowledged that their purchases from the Company were governed by AMS's terms and conditions. Those terms and conditions require Plaintiffs to submit their claims against AMS to arbitration before the American Arbitration Association, in their individual capacities only

and not as a member or representative of a class. As explained in greater detail below, and pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., the Court should grant Defendant's Motion, compel Plaintiffs to individually submit their claims against AMS to arbitration in accordance with the parties' written agreements, and stay these proceedings pending the outcome of those arbitrations.

## **FACTS**

AMS is a direct marketing company that sells collectible coins, numismatics, and other collectible products. (*See* Declaration of Robert Ostman, filed contemporaneously herewith ("Ostman Decl."), ¶ 5.) AMS markets its products via multiple advertising channels: print, radio, television, catalog, direct mail, and online at its website, www.govmint.com. (*Id*.) AMS does not cold-call potential customers; rather, all of AMS's customers (including the three plaintiffs here) come to AMS via one of these general, direct marketing channels. (*Id*.)

### **A. PLAINTIFF BALLOU**

Between June 2015 and December 2019, Ballou placed 39 orders with AMS.[1] (*See* Ostman Decl., ¶ 7, Ex. 1.)

---

[1]   This does not include an order Ballou placed with AMS on June 15, 2015. (Ostman Decl., ¶ 7.) Ballou returned this purchase to AMS on July 2, 2015 for a full refund pursuant to the Company's 30-day return policy. (*Id*.)

**1. BALLOU AGREED TO AMS'S TERMS AND CONDITIONS BY PLACING ORDERS THROUGH THE COMPANY'S WEBSITE, AND THOSE TERMS AND CONDITIONS REQUIRE BALLOU TO ARBITRATE HIS CLAIMS AGAINST AMS IN HIS INDIVIDUAL CAPACITY**

Ballou made his first purchase from AMS on June 2, 2015 through the Company's website. (*Id*., ¶ 8, Ex. 1 at 1.) At the time Ballou placed his first order with the Company, AMS informed him that by placing his order he was agreeing to the Company's terms and conditions (the "Terms and Conditions"), provided him a link to the Terms and Conditions, and required Ballou to affirmatively agree to AMS's terms and conditions at the time he placed his order. (*Id*., ¶ 9.) The below screenshot shows what Ballou would have seen when placing his order via AMS's website on June 2, 2015, including a hyperlink to the Company's Terms and Conditions:



(*Id*., ¶ 10.) Ballou could not have completed his June 2, 2015 order via AMS's website without clicking on the "Place Your Order" link identified in the above screenshot. (*Id*., ¶ 11.)

As of June 2, 2015, AMS's Terms and Conditions included a return policy whereby a customer could return items he or she purchased from the Company for a full refund within 30 days. (*Id*., ¶ 12, Ex. 2 at ¶ 2.) As of June 2, 2015, the Company's Terms and Conditions also stated: (a) the Terms and Conditions governed that transaction and any other transactions between Ballou and AMS; (b) the exclusive venue for disputes between

the customer and AMS regarding any transaction with the Company would be the American Arbitration Association ("AAA") office in Minneapolis, Minnesota; and (c) in connection with any such dispute, the customer could assert claims against AMS only in his or her individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id*., ¶ 13, Ex. 2 at ¶¶ 1, 6.)

Ballou subsequently made two additional purchases from AMS through the Company's website—one on December 22, 2015, and one on January 7, 2016. (*Id*., ¶ 14, Ex. 1 at 1.) At the time Ballou placed these orders, AMS had the same on-line order process in place as it had at the time Ballou made his June 2, 2015 purchase from the Company. (*Id*., ¶ 15.) In other words, as part of the online order process AMS informed Ballou that by placing his order he was agreeing to the Company's Terms and Conditions, provided him link to the Terms and Conditions, and required Ballou to affirmatively agree to AMS's Terms and Conditions at the time he placed his order. (*Id*.) AMS's Terms and Conditions were the same on December 22, 2015 and January 7, 2016 as they were when Ballou made his first purchase from the Company on June 2, 2015. (*Id*., ¶ 16.)

**2. AMS SENT BALLOU INVOICES WITH RESPECT TO EVERY PURCHASE HE MADE FROM THE COMPANY, WHICH REFERENCED THE COMPANY'S TERMS AND CONDITIONS AS WELL AS BALLOU'S RIGHT TO RETURN HIS PURCHASES TO AMS**

At all times between June 2015 and August 2020, when a customer purchased a product from AMS, the Company shipped that product to the customer along with an invoice relating to that purchase. (*Id*., ¶ 17.) AMS sent such an invoice to each of its customers in connection with each purchase every such customer made from the Company.

(*Id*.) The invoice AMS sent Ballou regarding his June 2, 2015 purchase—i.e., his first purchase from the Company—provided that by making his purchase Ballou consented to the Terms and Conditions set forth on the back of the invoice. (*Id*., ¶ 18, Ex. 2 at 1.) That invoice also stated that if Ballou had any questions regarding the Terms and Conditions—which were printed on the back of the invoice—he should contact the Company's customer service department by calling a toll-free number provided on the invoice, by sending an email to an address specified on the invoice, or by visiting AMS's website. (*Id*. ¶ 19, Ex. 2 at 1.) The Terms and Conditions set forth on the back of the invoice AMS sent to Ballou regarding his June 2, 2015 purchase stated: (a) the Terms and Conditions governed that transaction and any other transactions between Ballou and AMS; (b) Ballou had a right to return any item he had purchased from the Company within 30 days; (c) the exclusive venue for any dispute between Ballou and AMS regarding any transaction with the Company would be the AAA office in Minneapolis, Minnesota; and (d) in connection with any such dispute, Ballou could assert claims against AMS only in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id*., Ex. 2 at 2.) All of the invoices AMS sent to Ballou with respect to his purchases from the Company between June 2, 2015 and November 9, 2017 contained these terms. (*Id*., ¶ 20, Ex. 3 – Ex. 33.)

On or about November 14, 2017, AMS revised the form of its customer invoices. (*Id*., ¶ 21.) On December 14, 2017, Ballou made a purchase from AMS. (*Id*., ¶ 22, Ex. 1 at 2.) The invoice AMS sent Ballou regarding his December 14, 2017 purchase provided that by making his purchase Ballou consented to the terms and conditions set forth on the

back of the invoice. (*Id.*, ¶ 23, Ex. 34 at 1.) That invoice also stated that AMS's Terms and Conditions were available at www.govmint.com/terms-conditions, by calling a toll-free number provided on the invoice, or by sending an email to an address specified on the invoice. (*Id.*, ¶ 24, Ex. 34 at 1.) The Terms and Conditions set forth on the back of the invoice AMS sent to Ballou regarding his December 14, 2017 purchase stated: (a) the Terms and Conditions governed that transaction and any other transactions between Ballou and AMS; (b) Ballou had a right to return any non-bullion item he had purchased from the Company within 30 days[2]; (c) the exclusive venue for any legal claim Ballou had against AMS arising out of or relating to the Terms and Conditions or any transaction, interaction, or communication with the Company would be a confidential, binding arbitration proceeding before the AAA in Minneapolis, Minnesota; and (d) Ballou could bring any such claim only in his individual capacity and not as member of a class. (*Id.*, Ex. 34 at 2.) All of the invoices Ballou received from AMS with respect to his purchases from the Company between December 14, 2017 and August 9, 2018 contained these terms. (*Id.*, ¶ 25, Ex. 35 – Ex. 40.)

In addition to the invoices AMS sent Ballou for each of the 39 separate transactions Ballou made with AMS, with respect to 33 of the 39 orders Ballou placed with the Company, AMS also sent Ballou: (a) an email confirming his order; and (b) an email notifying him that the Company had shipped his order. (*Id.*, ¶ 26, Ex. 41 – Ex. 42.) AMS

---

[2] Ballou never purchased a bullion item from AMS. (*Id.*, ¶ 35, Ex. 1 at 1-2.)

provided links to its Terms and Conditions at the bottom of each of these emails it sent to Ballou. (*Id.*)

### 3. BALLOU INFORMS AMS CUSTOMER SERVICE REPRESENTATIVES ALMOST 20 TIMES THAT HE UNDERSTOOD HIS PURCHASES FROM THE COMPANY WERE GOVERNED BY AMS'S TERMS AND CONDITIONS

In approximately February 2016, AMS implemented an order verification process for customer purchases made via phone that exceeded $2,495.[3] (*Id.*, ¶ 27.) Under this order verification process, after a customer purchases a product via phone from AMS the cost of which exceeds this threshold, the AMS sales representative who made the sale transfers the customer to one of the Company's Customer Service Representatives. (*Id.*, ¶ 28.) The AMS Customer Service Representative, working from a prepared script, then reviews certain aspects of the customer's order with him or her, including confirming that the customer understands: (a) AMS has a 30-day return policy; and (b) by keeping his or her purchase past this 30-day return period, the customer is agreeing to AMS's Terms and Conditions. (*Id.*) AMS records order verification calls with its customers. (*Id.*)

Ballou, made 18 purchases from AMS via phone between April 12, 2016 and August 9, 2018 that concluded with his participation in the Company's order verification process, as set forth in the table below.

---

[3]     On July 1, 2016, AMS lowered the threshold for this order verification process to customer purchases made via phone that exceeded $1,900. (*Id.*, ¶ 27.)

| DATE OF PURCHASE(S) |
| --- |
| April 12, 2016 |
| May 18, 2016 |
| July 6, 2016 |
| July 27, 2016 |
| August 19, 2016 |
| September 7, 2016 |
| November 11, 2016 |
| November 21, 2016 |
| December 27, 2016 |
| January 13, 2017 |
| June 7, 2017 |
| August 11, 2017 |
| September 12, 2017 |
| November 9, 2017 |
| December 14, 2017 |
| January 11, 2018 |
| February 27, 2018 |
| August 9, 2018 |

(*Id.*, ¶ 29.). During each of these order verification calls, Ballou acknowledged that he understood: (a) his purchase was governed by AMS's Terms and Conditions[4]; and (b) he could return his purchase to the Company within 30 days.[5]

### 4. AMS PROVIDES BALLOU NOTICE OF CHANGES IN THE COMPANY'S TERMS AND CONDITIONS, AND EXPRESSLY REFERENCES THE ARBITRATION CLAUSE CONTAINED IN THE TERMS AND CONDITIONS

On October 31, 2017, AMS sent Ballou an email notifying him of a change in the Company's Terms and Conditions. (*See* Declaration of Kelsey Knight, filed contemporaneously herewith ("Knight Decl."), ¶¶ 4-6.) In that email, AMS notified Ballou that the Company had updated its Terms and Conditions and its return policy, and provided a link to both. (*Id.*, ¶ 7, Ex. 2.) The email the Company sent to Ballou also specifically drew attention to changes AMS was making to the arbitration agreement contained within the Terms and Conditions, and specified that "[u]nder the terms of the arbitration provision, claims will be resolved by individual (and not class-wide) arbitration." (*Id.*)

The updated Terms and Conditions referenced in the October 31, 2017 email AMS sent to Ballou (and available at the link contained in that email) included the following

---

[4]     *See* Declaration of Mack H. Reed, filed contemporaneously herewith ("Reed Decl."), Ex. 1 at 3:4-5, 8; Ex. 2 at 3:7-8, 11; Ex. 3 at 4:7-10, 12; Ex. 4 at 3:11-13, 17; Ex. 5 at 2:18-20, 22; Ex. 6 at 3:6-9; Ex. 7 at 2:20-22, 25; Ex. 8 at 2:20-22, 24; Ex. 9 at 2:22-24, 3:2; Ex. 10 at 2:22-23, 3:1; Ex. 11 at 3:19-22; Ex. 12 at 3:1-2, 5; Ex. 13 at 3:7-9, 12; Ex. 14 at 2:24-25, 3:3; Ex. 15 at 3:6-7, 10; Ex. 16 at 2:22-25; Ex. 18 at 2:24-25, 3:1, 4.

[5]     Reed Decl., Ex. 1 at 3:9-11; Ex. 2 at 3:12-15; Ex. 3 at 4:13-16; Ex. 4, 15-17; Ex. 5 at 2:23-3:1; Ex. 6 at 3:12-14; Ex. 7 at 3:1-4; Ex. 8 at 2:25-3:3; Ex. 9 at 3:3-6; Ex. 10 at 3:2-5; Ex. 11 at 4:2-5; Ex. 12 at 3:6-8; Ex. 13 at 3:10-12; Ex. 14 at 3:4-7; Ex. 15 at 3:11-14; Ex. 16 at 3:4-8; Ex. 17 at 4:22-24; Ex. 18 at 3:5-8.

provisions: (a) the Terms and Conditions governed all of Ballou's communications and transactions with AMS; (b) by making purchases from the Company, Ballou agreed to be bound by the Terms and Conditions; (c) the exclusive venue for any legal claim arising out of or relating to the Terms and Conditions or any transaction or interaction between AMS and Ballou would be in an arbitration proceeding filed with the AAA office in Minneapolis, Minnesota; (d) such disputes would be governed by Minnesota law (excluding choice of law rules) and the AAA Arbitration Rules; (e) the arbitrator in such disputes would have the exclusive authority to resolve any dispute regarding the enforceability of the arbitration agreement; and (f) Ballou agreed that he would not bring any claim against AMS other than in his individual capacity, and that he would not bring a claim or participate in a claim as a class member in any purported class or representative proceeding. (Ostman Decl., ¶ 30, Ex. 43 at 1-2.)

### 5. AMS REVISES THE FORM OF ITS INVOICES, AND BALLOU MAKES HIS FINAL PURCHASE FROM THE COMPANY

In or about January 2019, AMS revised the form of its customer invoices. (*Id.*, ¶ 31.) On December 12, 2019, Ballou made a purchase from AMS via phone, and the Company recorded that call. (*Id.*, ¶ 32, Ex. 1 at 2.) The AMS sales representative with whom Ballou spoke on December 12, 2019 informed him during this call that: (a) Ballou had 30 days to return his purchase to AMS; and (b) if Ballou kept his purchase beyond 30 days, this constituted acceptance of the Company's Terms and Conditions. (Reed Decl., Ex. 19 at 9:25-10:4.)

The invoice AMS sent Ballou in connection with his December 12, 2019 purchase contained the following language:

> [AMS] is willing to sell its product(s) to you only if you accept all of our Terms and Conditions, which are available online at www.govmint.com/terms-conditions or by phone at 1-800-721-0320. If you do not agree to all of the Terms and Conditions, then GovMint.com is unwilling to sell its product(s) to you, in which case you must return your purchase for a full refund in accordance with our Return Policy. By keeping your purchase for more than 30 days after you receive it, you are agreeing to the Terms and Conditions.

(Ostman Decl., ¶ 32, Ex. 44 at 1.) At the time Ballou made this purchase from AMS, the Company's Terms and Conditions stated: (a) Ballou agreed and acknowledged he had carefully read and fully understood all of the provisions of the Terms and Conditions; (b) the Terms and Conditions governed all transactions between Ballou and the Company occurring on or after January 29, 2019; (c) any controversy or claim arising out of or relating to the Terms and Conditions, or any transaction between AMS and Ballou, would be settled by arbitration administered by the AAA in accordance with its Consumer Arbitration Rules; (d) any such arbitration would take place in Minneapolis, Minnesota or another location reasonably convenient for both parties; and (e) Ballou agreed that he could only bring claims against AMS in arbitration in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id.*, ¶ 33, Ex. 45 at 1.) The invoice AMS sent Ballou in connection with his December 12, 2019 purchase also included a description of the Company's return policy, which provided that Ballou was entitled to return his purchase to AMS within 30 days for a full refund. (*Id.*, ¶ 32, Ex. 44 at 2.)

Other than the purchase Ballou made from AMS on June 15, 2015 and subsequently returned on July 2, 2015, Ballou never returned any of his purchases to the Company. (*Id.*, ¶ 34.)

## B. PLAINTIFF WILLIAMSON

Williamson placed a total of two orders with AMS—one on July 11, 2020, and one on August 27, 2020. (*Id.*, ¶ 36, Ex. 46.) Williamson made these purchases via phone, and AMS recorded those calls. (*Id.*, ¶ 37.) During each of these two calls, AMS's sales representative informed Williamson that she had 30 days to return her purchases and, if she chose not to return her purchases, she agreed to be bound by the Company's Terms and Conditions. (Reed Decl., Ex. 20 at 15:4-8, 16:1-4; Ex. 21 at 17:12-16.) During these calls, the Company's sales representative also informed Williamson that the Terms and Conditions were available on AMS's website. (*Id.*, Ex. 20 at 15:7-8, 16:3-4; Ex. 21 at 17:15-16.) AMS's Terms and Conditions published on www.govmint.com and applicable to both of Williamson's transactions in July and August 2020, stated: (a) Williamson agreed and acknowledged she had carefully read and fully understood all of the provisions of the Terms and Conditions; (b) the Terms and Conditions governed all transactions between Williamson and the Company occurring on or after January 29, 2019; (c) any controversy or claim arising out of or relating to the Terms and Conditions, or any transaction between AMS and Williamson, would be settled by arbitration administered by the AAA in accordance with its Consumer Arbitration Rules; (d) any such arbitration would take place in Minneapolis, Minnesota or another location reasonably convenient for both parties; and (e) Williamson agreed that she could only bring claims against AMS in

arbitration in her individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (Ostman Decl., ¶ 38, Ex. 45 at 1.)

When AMS shipped Williamson's purchases to her, the Company also included an invoice with each of those purchases. (*Id.*, ¶ 39, Ex. 47 – Ex. 49.) The invoices AMS sent to Williamson in connection with these purchases contained the following language:

> [AMS] is willing to sell its product(s) to you only if you accept all of our Terms and Conditions, which are available online at www.govmint.com/terms-conditions or by phone at 1-800-721-0320. If you do not agree to all of the Terms and Conditions, then GovMint.com is unwilling to sell its product(s) to you, in which case you must return your purchase for a full refund in accordance with our Return Policy. By keeping your purchase for more than 30 days after you receive it, you are agreeing to the Terms and Conditions.

(*Id.*, Ex. 47 at 1; Ex. 48 at 1; Ex. 49 at 1.) The invoices AMS sent Williamson in connection with her purchases also included a description of the Company's return policy, which provided that Williamson was entitled to return her purchases to AMS within 30 days for a full refund. (*Id.*, Ex. 47 at 2; Ex. 48 at 2; Ex. 49 at 2.)

Williamson never returned any of the purchases she made from AMS to the Company. (*Id.*, ¶ 40.)

### C. **PLAINTIFF CULVER**

Culver placed 85 orders with AMS between April 10, 2013 and March 27, 2020. (*Id.*, ¶ 41, Ex. 50.)[6]

---

[6] This does not include orders Culver placed with AMS on July 24, 2013, October 22, 2013, March 10, 2016, and October 11, 2019. (Ostman Decl., ¶ 41.) Culver returned these purchases to AMS on August 9, 2013, November 1, 2013, March 31, 2016, and November 7, 2019, respectively, for a full refund pursuant to the Company's 30-day return policy. (*Id.*) Culver seeks damages individually for the period of 2013 to present, as well as seeking

**1. AMS SENT CULVER INVOICES WITH RESPECT TO EVERY PURCHASE HE MADE FROM THE COMPANY, WHICH REFERENCED THE COMPANY'S TERMS AND CONDITIONS AS WELL AS CULVER'S RIGHT TO RETURN HIS PURCHASES TO AMS**

As with Ballou and Williamson, when Culver purchased a product from AMS, the Company shipped that product to Culver along with an invoice relating to that purchase. (*Id.*, ¶ 16.) On May 6, 2014, Culver made a purchase from AMS. (*Id.*, ¶ 42, Ex. 50 at 2.) The invoice AMS provided Culver in connection with that purchase stated that by making his purchase from the Company, Culver consented to the Terms and Conditions set forth on the back of the invoice. (*Id.*, ¶ 43, Ex. 51 at 1.) That invoice also stated that if Culver had any questions regarding the Terms and Conditions, he should contact the Company's customer service department by calling a toll-free number provided on the invoice, by sending an email to an address specified on the invoice, or by visiting AMS's website. (*Id.* ¶ 44, Ex. 51 at 1.) The Terms and Conditions set forth on the back of the invoices AMS sent to Culver for all of his purchases from May 6, 2014 to October 26, 2017 stated: (a) the Terms and Conditions governed that transaction and any other transactions between Culver and AMS; (b) Culver had a right to return any item he had purchased from the Company within 30 days; (c) the exclusive venue for any dispute between Culver and AMS regarding any transaction with the Company would be the AAA office in Minneapolis, Minnesota; and (d) in connection with any such dispute, Culver could assert claims against AMS only

---

damages on behalf of a class on and after 2015. (Culver Compl. ¶¶ 49, 64.) Culver made two purchases from AMS in 2005 that are not at issue in this lawsuit.

in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id*., ¶ 45, Ex. 52 – Ex. 87, at 2.)

On November 20, 2017, Culver made a purchase from AMS. (*Id*., ¶ 46, Ex. 50 at 3.) The invoice AMS provided Culver in connection with that purchase stated that by making his purchase from the Company, Culver consented to the Terms and Conditions set forth on the back of the invoice. (*Id*., ¶ 47, Ex. 88 at 1.) The invoice AMS sent Culver regarding his November 20, 2017 purchase also stated that AMS's Terms and Conditions were available at www.govmint.com/terms-conditions, by calling a toll-free number provided on the invoice, or by sending an email to an address specified on the invoice. (*Id*., ¶ 48, Ex. 88 at 1.) The Terms and Conditions set forth on the back of the invoices AMS sent to Culver for all of his purchases from November 20, 2017 to January 22, 2019 stated: (a) all transactions with AMS are governed by the Company's Terms and Conditions; (b) Culver had a right to return any non-bullion item he had purchased from the Company within 30 days[7]; (c) the exclusive venue for any legal claim Culver had against AMS arising out of or relating to the Terms and Conditions or any transaction, interaction, or communication with the Company would be a confidential, binding arbitration proceeding before the AAA in Minneapolis, Minnesota; and (d) Culver could bring any such claim only in his individual capacity and not as member of a class. (*Id*., ¶ 49, Ex. 89 – Ex. 108, at 2.)

---

[7]     Culver never purchased a bullion item from AMS. (*Id*., ¶ 61, Ex. 50 at 1-4.)

On January 29, 2019, Culver made two purchases from AMS. (*Id.*, ¶ 51, Ex. 50 at

3.) The invoice AMS sent Culver regarding his January 29, 2019 purchases provided:

> [AMS] is willing to sell its product(s) to you only if you accept all of our
> Terms and Conditions, which are available online at
> www.govmint.com/terms-conditions or by phone at 1-800-721-0320. If you
> do not agree to all of the Terms and Conditions, then GovMint.com is
> unwilling to sell its product(s) to you, in which case you must return your
> purchase for a full refund in accordance with our Return Policy. By keeping
> your purchase for more than 30 days after you receive it, you are agreeing to
> the Terms and Conditions.

(*Id.*, ¶ 52, Ex. 109 at 1.) The invoice AMS sent Culver in connection with his January 29,

2019 purchases also included a description of the Company's return policy, which provided

that Culver was entitled to return his purchases to AMS within 30 days for a full refund.

(*Id.*, ¶ 53, Ex. 109 at 2.) At the time Culver made these purchases from AMS, and until

the time he stopped making purchases from the Company, AMS's Terms and Conditions

stated: (a) Culver agreed and acknowledged he had carefully read and fully understood all

of the provisions of the Terms and Conditions; (b) any controversy or claim arising out of

or relating to the Terms and Conditions, or any transaction between AMS and Culver,

would be settled by arbitration administered by the AAA in accordance with its Consumer

Arbitration Rules; (c) any such arbitration would take place in Minneapolis, Minnesota or

another location reasonably convenient for both parties; and (d) Culver agreed that he could

only bring claims against AMS in arbitration in his individual capacity, and not as a

plaintiff or class member in any purported class or representative proceeding. (*Id.*, ¶ 54,

Ex. 45.) All of the invoices Culver received from AMS with respect to his purchases from

the Company between January 29, 2019 and March 27, 2020 contained these terms. (*Id*., ¶ 53, Ex. 110 – Ex. 118.)

## 2. AMS PROVIDES CULVER WITH ORDER CONFIRMATION EMAILS WITH LINKS TO THE COMPANY'S TERMS AND CONDITIONS AND RETURN POLICY

For each of his purchases from AMS between February 3, 2014, and August 10, 2017, in addition to the invoices described above, AMS also sent Culver order confirmation emails containing links to the Company's Terms and Conditions and return policy. (Knight Decl., ¶ 9, Ex. 3 – Ex. 4.) As noted above, the Terms and Conditions for all of Culver's purchases from May 6, 2014 to October 26, 2017 stated: (a) the Terms and Conditions governed that transaction and any other transactions between Culver and AMS; (b) Culver had a right to return any item he had purchased from the Company within 30 days; (c) the exclusive venue for any dispute between Culver and AMS regarding any transaction with the Company would be the AAA office in Minneapolis, Minnesota; and (d) in connection with any such dispute, Culver could assert claims against AMS only in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.

For each of Culver's 37 purchases after August 10, 2017—i.e., from September 14, 2017 to March 28, 2020—AMS, through its third-party email service providers sent Culver two emails: one order confirmation email, and one shipping confirmation email. (Knight Decl., ¶¶ 10-12, Ex. 5 – Ex. 8.) Each email contained links to AMS's Terms and Conditions and return policy. (*Id*.) Again, those Terms and Conditions provided (a) the Terms and Conditions governed that transaction and any other transactions between Culver and AMS;

(b) Culver had a right to return any item he had purchased from the Company within 30 days; (c) the exclusive venue for any dispute between Culver and AMS regarding any transaction with the Company would be the AAA office in Minneapolis, Minnesota; and (d) in connection with any such dispute, Culver could assert claims against AMS only in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id.*)

### 3. AMS PROVIDES CULVER NOTICE OF CHANGES IN THE COMPANY'S TERMS AND CONDITIONS, AND EXPRESSLY REFERENCES THE ARBITRATION CLAUSE CONTAINED IN THE TERMS AND CONDITIONS

On October 31, 2017, AMS sent Culver an email notifying him of a change in the Company's Terms and Conditions. (Knight Decl., ¶¶ 4–6, Ex. 1.) In that email, AMS notified Culver that the Company had updated its Terms and Conditions and its return policy, and provided a link to both. (*Id.*, ¶ 4–6, Ex. 1.) The email the Company sent to Culver also specifically drew attention to changes AMS was making to the arbitration agreement contained within the Terms and Conditions, and specified that "[u]nder the terms of the arbitration provision, claims will be resolved by individual (and not class-wide) arbitration." (*Id.*)

The updated Terms and Conditions referenced in the October 31, 2017 email AMS sent to Culver (and available at the link contained in that email) included the following terms: (a) the Terms and Conditions governed all of the customer's communications and transactions with AMS; (b) by making purchases from the Company, Culver agreed to be bound by the Terms and Conditions; (c) the exclusive venue for any legal claim arising out of or relating to the Terms and Conditions or any transaction or interaction between AMS

and Culver would be in an arbitration proceeding filed with the AAA office in Minneapolis, Minnesota; (d) such disputes would be governed by Minnesota law (excluding choice of law rules) and the AAA Arbitration Rules; (e) the arbitrator in such disputes would have the exclusive authority to resolve any dispute regarding the enforceability of the arbitration agreement; and (f) Culver agreed that he would not bring any claim against AMS other than in his individual capacity, and that he would not bring a claim or participate in a claim as a class member in any purported class or representative proceeding. (Ostman Decl., ¶ 30, Ex. 43 at 1-2.)

On January 29, 2019, AMS sent another email to Culver advising him of changes to the Company's Terms and Conditions. (Knight Decl., ¶ 13.) In that email, AMS notified Culver that the Company had updated its Terms and Conditions and its return policy, and provided a link to both. (*Id*., ¶ 13-15, Ex. 9 – Ex. 10.) The email the Company sent to Culver also specifically drew attention to changes AMS was making to the arbitration agreement contained within the Terms and Conditions. (*Id*..) The Terms & Conditions at that time provided (a) Culver agreed and acknowledged he had carefully read and fully understood all of the provisions of the Terms and Conditions; (b) the Terms and Conditions governed all transactions between Culver and the Company occurring on or after January 29, 2019; (c) any controversy or claim arising out of or relating to the Terms and Conditions, or any transaction between AMS and Culver, would be settled by arbitration administered by the AAA in accordance with its Consumer Arbitration Rules; (d) any such arbitration would take place in Minneapolis, Minnesota or another location reasonably convenient for both parties; and (e) Culver agreed that he could only bring claims against

AMS in arbitration in his individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (Ostman Decl., ¶ 33, Ex. 45.)

### 4. AMS CUSTOMER SERVICE REPRESENTATIVES ADVISE CULVER THAT HIS PURCHASES FROM THE COMPANY WERE GOVERNED BY AMS'S TERMS AND CONDITIONS

In approximately February 2016, AMS implemented an order verification process for customer purchases made via phone that exceeded certain dollar thresholds, as referenced *supra*. (*Id*., ¶ 27.) AMS records order verification calls with its customers. (*Id.* at ¶ 28.) On February 7, 2018, Culver made a purchase from AMS. (*Id*., ¶ 50, Ex. 50 at 3.) Culver made that purchase from AMS via phone, and that purchase concluded with his participation in the Company's order verification process. (*Id*.) During that call, Culver confirmed that he understood that his purchase was governed by AMS's Terms and Conditions, and that AMS had a thirty-day return policy. (Reed Decl., Ex. 22, at 2:3–8.)

On March 7, 2019, Culver made a purchase from AMS. (Ostman Decl., ¶ 56, Ex. 50 at 3.) Culver made this purchase from AMS via phone, and the Company recorded that call. (*Id*.) During that call, Culver affirmed that his purchase was conditioned on his acceptance of AMS's Terms and Conditions that were available on its website, and that he had thirty days to return the product based on AMS's Terms and Conditions. (Reed Decl., Ex. 23, at 6:13–23.)

### 5. CULVER SIGNS THE AMS CUSTOMER ACCOUNT AGREEMENT

On August 5, 2019, Culver signed a Customer Account Agreement with AMS. (Ostman Decl., ¶ 57, Ex. 119.) The Customer Account Agreement Culver signed provides that it governs all transactions and interactions between Culver and AMS, regardless of

when they occurred or by what method they occurred. (*Id.*, ¶ 58, Ex. 119 at 1.) Culver's Customer Account Agreement also provides that any controversy or claim arising out of that agreement, including the enforceability of that agreement, and any transactions between Culver and AMS taking place after August 5, 2019, were subject to arbitration administered by the AAA in accordance with its Consumer Arbitration Rules. (*Id.*, ¶ 59, Ex. 119 at 1.) The Customer Account Agreement further provides that any such claims may only be brought in Culver's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. (*Id.*)

## LEGAL STANDARD

The Federal Arbitration Act (the "FAA" or the "Act") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act reflects "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and is intended to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985). *See also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (the FAA requires courts to "rigorously enforce agreements to arbitrate"); *Faber v. Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004) ("There is a strong federal policy favoring arbitration.").

A party aggrieved by the refusal of another to arbitrate under a written agreement to do so may petition any United States district court for an order directing that such arbitration proceed in the manner provided for in that agreement. 9 U.S.C. § 4. Arbitration agreements are interpreted liberally, with any doubts resolved in favor of arbitration.

*MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005); *see also Moses H. Cone*, 460 U.S. at 24-25. "By its terms, the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration" regarding disputes falling within the scope of an arbitration agreement. *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004) (citing *Byrd*, 470 U.S. at 218) (quotation marks omitted, emphasis in original).

Motions to compel arbitration are treated as motions to dismiss for lack of subject-matter jurisdiction. *See, e.g., Richert v. Nat'l Arbitration Forum, LLC*, No. 09-763 ADM/JJK, 2009 WL 3297565, at *6 n.1 (D. Minn. Oct. 13, 2009) (citing *Evans v. Hudson Coal Co.*, 165 F.2d 970, 972 (3d Cir. 1948)). The Court may therefore consider matters beyond the pleadings in resolving such a motion. *Deuser v. Vecera*, 139 F.3d 1190, 1191 n.3 (8th Cir. 1998). Although Rule 56 is not directly on point with respect to motions to compel arbitration,[8] where a party submits matters outside the pleadings in connection with such a motion a court should consider that motion "using summary judgment standards." *Stinson v. Best Buy Co., Inc.*, No. 0:18-cv-00295-JNE-KMM, 2018 WL 3850739, at *5 (D. Minn. June 26, 2018) (citing *City of Benkelman*, 867 F.3d at 881). Where there is no genuine issue of material fact as to whether the parties agreed to arbitrate their dispute, discovery and a jury trial are not warranted. *Nielsen v. Grain Millers, Inc.*, No. 16-cv-3103 (WMW/TNL), 2017 WL 11569190, at *7 n.4 (D. Minn. May 2, 2017) (relying on *Dillard*

---

[8]    *City of Benkelman, Nebraska v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017).

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1155 (5th Cir. 1992); *cf.* 9 U.S.C. § 4.

## **ARGUMENT**

## I. **PLAINTIFFS' CLAIMS AGAINST AMS ARE SUBJECT TO ARBITRATION**

### A. **THE PARTIES DELEGATED THE "GATEWAY" ISSUES OF ARBITRABILITY TO THE ARBITRATOR**

"The purpose of the FAA is to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Koch v. Compucredit Corp.*, 543 F.3d 460, 463 (8th Cir. 2008) (citing *Moses H. Cone*, 460 U.S. at 22) (quotation marks omitted). To accomplish this goal, "Congress provided a limited role for courts, allowing them to consider only issues relating to the making and performance of the agreement to arbitrate." *Id*. (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)) (quotation marks omitted).

Typically, when presented with a motion to compel arbitration pursuant to the Act, a court must determine: (a) whether a valid arbitration agreement exists between the parties; and (b) whether the specific dispute is within the scope of the agreement. *Pro Tech*, 377 F.3d at 871 (citing *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)). And because arbitration is a matter of contract, these substantive or "gateway" questions of arbitrability are presumptively committed to judicial determination (as opposed to determination by an arbitrator). *Id*. (citing *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). *See also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (the question whether the parties have submitted a particular dispute to

arbitration, *i.e.*, the question of arbitrability, is presumptively an issue for judicial determination). However, where there is clear and unmistakable evidence the parties intended to commit these substantive or "gateway" questions of arbitrability to an arbitrator, a court may not decide these issues and must refer them to arbitration. *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). *See also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

Here, AMS and the Plaintiffs agreed to arbitrate these "gateway" questions of arbitrability. Where parties explicitly incorporate the AAA rules of arbitration into their agreement, the parties have delegated the question of arbitrability to the arbitrator. *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *FJM Props.*, 756 F.3d at 1100 (finding that incorporation of the AAA Rules evinces a clear and unmistakable intent to delegate the issue of arbitrability to the arbitrator). AMS's Terms and Conditions specified that the parties' disputes would be heard before the AAA, and additionally: (a) as of October 31, 2017, the Company's Terms and Conditions provided that any arbitration between the parties would be governed by the AAA Arbitration Rules, and that the arbitrator would have the exclusive authority to resolve any dispute regarding the enforceability of the arbitration agreement (Ostman Decl., ¶ 30, Ex. 43); and (b) as of January 2019, the Company's Terms and Conditions provided that any arbitration between the parties would be administered by the AAA in accordance with its Consumer Arbitration Rules. (Ostman Decl., ¶ 33, Ex. 45 at 1.) This constitutes a clear and unmistakable intent to delegate the issue of arbitrability to the arbitrator. *Fallo*, 559 F.3d at 878; *FJM Props.*, 756 F.3d at 1100.

The Court must therefore compel the arbitration of Plaintiff's claims against AMS, even with respect to the "gateway question" of arbitrability.

**B.** **EVEN IF THE PARTIES HAD NOT DELEGATED THE "GATEWAY" ISSUE OF ARBITRABILITY TO THE ARBITRATOR, VALID ARBITRATION AGREEMENTS EXIST BETWEEN THE PARTIES AND THIS DISPUTE IS WITHIN THE SCOPE OF THOSE AGREEMENTS, AND THE COURT MUST THEREFORE COMPEL ARBITRATION**

Even if the parties had not delegated the "gateway question" of arbitrability to the arbitrator—and they have—the Court must still compel arbitration because: (a) a valid arbitration agreement exists between the AMS and Plaintiffs; and (b) this specific dispute is within the scope of that agreement. AMS's Motion should therefore be granted.

**1.** **VALID ARBITRATION AGREEMENTS EXIST BETWEEN THE PARTIES**

If the parties had not delegated the "gateway question" of arbitrability to the arbitrator, this Court's first inquiry would be whether a valid arbitration agreement exists between AMS and Plaintiffs. *See Pro Tech*, 377 F.3d at 871 (citing *Bazzle*, 539 U.S. at 452).[9] And valid arbitration agreements exist between AMS and Plaintiffs. The validity of an arbitration agreement is determined by state contract law. *Lyster v. Ryan's Family Steak*

---

[9]     AMS recognizes that if Plaintiffs challenge the validity of the precise agreements to arbitrate at issue, then the enforceability of those agreements is a question for the Court—irrespective of whether the parties delegated "gateway" questions of arbitrability to an arbitrator. *See Jackson*, 561 U.S. at 71 (if a party challenges the validity "of the precise agreement to arbitrate at issue," the Court must resolve that challenge before compelling arbitration—even if the language of the arbitration agreement delegates the determination of arbitrability to the arbitrator.). Challenges to the validity of the parties' contract as a whole, however, must be decided by the arbitrator. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006). And a court must enforce a specific agreement to arbitrate despite a litigant's challenge to the contract as a whole or to another provision of the contract. *M.A. Mortensen Co. v. Saunders Concrete Co., Inc.*, 676 F.3d 1153, 1157 (8th Cir. 2012) (citing *Jackson*, 561 U.S. at 70).

*Houses, Inc.*, 239 F.3d 943, 946 (8th Cir. 2001). But when making this determination a court only applies general state contract law—in other words, a court "may not invalidate an arbitration agreement under any state law applicable only to arbitration provisions; instead, [a court] may apply only a state's general contract defenses." *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998). And even though courts apply state contract law in determining whether a binding agreement arose between the parties, courts also take into account the federal policy favoring arbitration when applying state law in this context. *See Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005) (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). *See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (when determining whether the parties agreed to arbitrate a dispute, a court applies "the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.").

As detailed above, Plaintiffs agreed to arbitrate any disputes that arose between them and AMS relating to purchases the Plaintiffs made from the Company. At all relevant times, AMS's Terms and Conditions contained an arbitration clause that required Plaintiffs to submit any disputes regarding any transaction between them and the Company to AAA arbitration (and to do so in their individual capacities only). (Ostman Decl., ¶ 13, Ex. 2 at ¶ 6; ¶ 19, Ex. 2 at 2; ¶ 24, Ex. 34 at 2; ¶ 30, Ex. 43; ¶ 33, Ex. 45 at 1; ¶ 38, Ex. 45; ¶ 44, Ex. 51 at 2; ¶ 48, Ex. 88 at 2; ¶ 54, Ex. 45.) With respect to Ballou: (a) he agreed to the Company's Terms and Conditions at the time he placed orders through AMS's

website[10]; (b) the invoices AMS sent him stated that he agreed to be bound by AMS's Terms and Conditions[11]; (c) the invoices AMS sent him also stated that he agreed to submit any disputes regarding any transaction between him and the Company to AAA arbitration (and to do so in his individual capacity only)[12]; (d) AMS notified him via email in November 2017 of changes in the Company's Terms and Conditions, and specifically drew attention to changes AMS was making to the arbitration agreement contained within the Terms and Conditions[13]; and (e) on at least 18 separate occasions, Ballou acknowledged in a phone call with an AMS representative that he understood his purchases from the Company were governed by AMS's Terms and Conditions.[14] With respect to Williamson: (a) the invoices AMS sent her stated that if she did not return her purchases within 30 days she thereby agreed to be bound by AMS's Terms and Conditions[15]; and (b) during both of the calls during which Williamson purchased a product from the Company, she acknowledged that if she did not return her purchases within 30 days she would be bound

---

[10]    Ostman Decl., ¶ 8, Ex. 1 at 1; ¶ 9-101 ¶ 14-15.

[11]    Ostman Decl., ¶18, Ex. 2 at 1; ¶ 20, Ex. 3 – Ex. 33; ¶ 23, Ex. 34 at 1; ¶ 25, Ex. 35 – Ex. 40; ¶ 32, Ex. 44 at 1.

[12]    Ostman Decl., ¶ 19, Ex. 2 at 2; ¶ 20, Ex. 3 – Ex. 33; ¶ 24, Ex. 34 at 2; ¶ 25, Ex. 35 – Ex. 40.

[13]    Knight Decl., ¶¶ 4-6; ¶ 7, Ex. 2.

[14]    Reed Decl., Ex. 1 at 3:4-5, 8; Ex. 2 at 3:7-8, 11; Ex. 3 at 4:7-10, 12; Ex. 4 at 3:11-13, 17; Ex. 5 at 2:18-20, 22; Ex. 6 at 3:6-9; Ex. 7 at 2:20-22, 25; Ex. 8 at 2:20-22, 24; Ex. 9 at 2:22-24, 3:2; Ex. 10 at 2:22-23, 3:1; Ex. 11 at 3:19-22; Ex. 12 at 3:1-2, 5; Ex. 13 at 3:7-9, 12; Ex. 14 at 2:24-25, 3:3; Ex. 15 at 3:6-7, 10; Ex. 16 at 2:22-25; Ex. 18 at 2:24-25, 3:1, 4; Ex. 19 at 9:25-10:4.

[15]    Ostman Decl., ¶ 39, Ex. 47 at 1, Ex. 48 at 1, Ex. 49 at 1.

by AMS's Terms and Conditions.[16] With respect to Culver: (a) the invoices AMS sent him stated that he agreed to be bound by AMS's Terms and Conditions[17]; (c) the invoices AMS sent him also stated that he agreed to submit any disputes regarding any transaction between him and the Company to AAA arbitration (and to do so in his individual capacity only)[18]; (d) AMS notified him via email in October 2017 of changes in the Company's Terms and Conditions, and specifically drew attention to changes AMS was making to the arbitration agreement contained within the Terms and Conditions[19]; (e) on at least two separate occasions, Culver acknowledged in a phone call with AMS that he understood his purchases from the Company were governed by AMS's Terms and Conditions;[20] and (f) he signed a Customer Account Agreement with AMS containing an arbitration provision.[21]

These types of agreements—*i.e.*, agreements where the terms are only provided online, or where the terms are provided only after the buyer has purchased goods from the seller—are known as "clickwrap" or "shrinkwrap" agreements. *Rasschaert v. Frontier Commc'ns Corp.*, No. 12-3108 (DWF/JSM), 2013 WL 1149549, at *6 (D. Minn. March 19, 2013) (citing *Siebert v. Amateur Athletic Union of the U.S., Inc.*, 422 F. Supp. 2d 1033, 1040 (D. Minn. 2006)). Courts across the country—including in Minnesota—routinely

---

[16]     Reed Decl., Ex. 20 at 15:4-8, 16:1-4; Ex. 21 at 17:12-16.

[17]     Ostman Decl., ¶ 43, Ex. 51 at 1; ¶ 45, Ex. 52 – Ex. 87; ¶ 47, Ex. 88 at 1; ¶ 49, Ex. 89 – Ex. 108; ¶ 52, Ex. 109 at 1; ¶ 55, Ex. 110 – Ex. 118.

[18]     Ostman Decl., ¶ 44, Ex. 51 at 2; ¶ 45, Ex. 52 – Ex. 91; ¶ 48, Ex. 88 at 2; ¶ 49, Ex. 89 – Ex. 108; ¶ 54, Ex. 45; ¶ 55, Ex. 110 – Ex. 118.

[19]     Knight Decl., ¶¶ 4-7.

[20]     Reed Decl., Ex. 22 at 2:3–8 and Ex. 23 at 6:13–23.

[21]     Ostman Decl., ¶¶ 57-59, Ex. 119.

enforce "shrinkwrap" or "clickwrap" agreements, and in doing so, have recognized that the practical realities of modern-day commerce require that these terms and conditions bind purchasers. The *Rasschaert* case is instructive on this issue. In *Rasschaert*, the plaintiff and putative class member had subscribed by telephone to high-speed internet services provided by the defendant. 2013 WL 1149549, at *1. The plaintiff subsequently received monthly bills from the defendant, all of which contained a statement that defendant was providing its services pursuant to its terms and conditions, as well as the URL of defendant's website where those terms and conditions could be found. *Id*. at *2. The plaintiff continued using the defendant's goods after receiving the bills referencing defendant's terms and conditions. *Id*. The plaintiff and others filed a putative class action against the defendant for allegedly charging improper fees. *Id*. The defendant moved to compel arbitration, and the court granted the defendant's motion:

> Facilitating customer payment and subscription before the full terms and conditions are revealed is not an uncommon business practice. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997) [hereinafter *Hill*] . . . . In fact, most courts that have considered the issue have upheld arbitration and forum-selection clauses in so-called clickwrap or shrinkwrap form contracts, which occur when the terms are provided online, or only after plaintiffs have manifested assent.

*Id*. at *6 (quotation marks omitted). *See also Wold v. Dell Fin. Servs., Inc.*, 598 F. Supp. 2d 984, 987 (D. Minn. 2009) (citing *Hill* for the proposition that courts "routinely" enforce "shrinkwrap" agreements); *Siebert*, 422 F. Supp. 2d at 1040 (same).

*Hill* and *ProCD, Inc. v. Zeidenberg*[22] are "widely considered to be the two leading cases" on the enforceability of shrinkwrap agreements. *DeFontes v. Dell, Inc.*, 984 A.2d 1061, 1068 (R.I. 2009). The *Hill* court (relying in large part on *ProCD*) held that when a merchant delivers a product that includes additional terms and conditions, but provides the consumer the right to return the product for a refund within a reasonable time, a consumer who retains the goods beyond that period is bound by the terms and conditions delivered contemporaneously with the product. *Hill*, 105 F.3d at 1148-49. The practical realities of modern consumer transactions all but compel this result, as Judge Easterbrook explained at length:

> [*ProCD*] holds that terms inside a box of software bind consumers who use the software after an opportunity to read the terms and to reject them by returning the product. . . . Practical considerations support allowing vendors to enclose the full legal terms with their products. Cashiers cannot be expected to read legal documents to customers before ringing up sales. ***If the staff at the other end of the phone for direct-sales operations such as Gateway's had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers. Others would hang up in a rage over the waste of their time***. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it.

*Hill*, 105 F.3d at 1149 (emphasis added).

> It is simply unreasonable to expect a seller to apprise a consumer of every term and condition at the moment he or she makes a purchase. A modern consumer neither expects nor desires to wade through such minutia, ***particularly when making a purchase over the phone, where full disclosure of the terms would border on the sadistic***. ***Nor do we believe that, after placing a telephone order for a computer, a reasonable consumer would believe that he or she has entered into a fully consummated agreement***. Rather, he or she is aware that with delivery comes a multitude of standard

---

22      86 F.3d 1447 (7th Cir. 1996).

terms attendant to nearly every consumer transaction. [Contract] formation occurs when the consumer accepts the full terms after having a reasonable opportunity to refuse them.

*Id.* (emphasis added, citation omitted).

The majority view—which has been adopted by courts in this District—is that consumer contracts under which the consumer pays and receives terms later are valid and enforceable, provided that the consumer has the opportunity to return the product in order to avoid any term or condition that he or she found to be unacceptable. *See, e.g., DeFontes*, 984 A.2d at 1068; *I. Lan Sys., Inc. v. Netscout Serv. Level Corp.,* 183 F. Supp. 2d 328, 337-38 (D. Mass. 2002); *O'Quin v. Verizon Wireless*, 256 F. Supp. 2d 512, 515-16 (M.D. La. 2003); *Bischoff v. DirecTV, Inc.*, 180 F.Supp.2d 1097, 1101 (C.D. Cal. 2002); *Lozano v. AT & T Wireless,* 216 F. Supp. 2d 1071, 1073 (C.D. Cal. 2002); *Moore v. Microsoft Corp.,* 293 A.D. 2d 587, 587 (N.Y. App. Div. 2002); *Brower v. Gateway 2000, Inc.,* 246 A.D. 2d 246, 251 (N.Y. App. Div.1998); *M.A. Mortenson Co. v. Timberline Software Corp.*, 970 P.2d 803, 809 (Wash. Ct. App. 1999); *DeJohn v. TV Corp. Int'l*, 245 F. Supp. 2d 913, 918-19 (N.D. Ill. 2003); *Forest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1008-09 (D.C. Ct. App. 2002); *Am. Online, Inc. v. Booker*, 781 So. 2d 423, 425 (Fla. Dist. Ct. App. 2001); *Caspi v. Microsoft Network L.L.C.*, 732 A.2d 528, 533 (N.J. Super. Ct. App. Div. 1999); *Mortg. Plus, Inc. v. DocMagic, Inc.*, No. 03-2582-GTV-DJW, 2004 WL 2331918, at *6 (D. Kan. Aug. 23, 2004); *Hopkins v. Trans Union, L.L.C.*, No. 03-5433 ADM/RLE, 2004 WL 1854191, at *2 (D. Minn. Aug 19, 2004); *Stenzel v. Dell, Inc.*, 870 A.2d 133, 140 (Me. 2005); *Adams v. Dell Computer Corp.*, No. CIV A C-06-089, 2006 WL 2670969, at *4 (S.D. Tex. Sept. 18, 2006); *Sherr v. Dell, Inc.*, No. 05 CV

100097(GBD), 2006 WL 2109436, at *3 (S.D.N.Y. July 27, 2006); *Falbe v. Dell, Inc.*, No. 04-C-1425, 2004 WL 1588243, at *3 (N.D. Ill. July 14, 2004).

That is precisely what occurred here. AMS repeatedly informed Ballou,[23] Williamson,[24] and Culver,[25] that they had 30 days to return their purchases to the Company. AMS repeatedly informed Ballou,[26] Williamson,[27] and Culver[28] that their purchases were governed by the Company's Terms and Conditions. AMS repeatedly told Ballou,[29]

---

[23]   *See, e.g.*, Ostman Decl., ¶ 9; ¶ 12, Ex. 2 at ¶ 2; ¶ 15; ¶ 19, Ex. 2 at 2; ¶ 20, Ex. 3 – Ex. 33; ¶ 24, Ex. 34 at 2; ¶ 25, Ex. 35 – Ex. 40; ¶ 33, Ex. 45 at 1-2; Reed Decl., Ex. 1 at 3:9-11; Ex. 2 at 3:12-15; Ex. 3 at 4:13-16; Ex. 4, 15-17; Ex. 5 at 2:23-3:1; Ex. 6 at 3:12-14; Ex. 7 at 3:1-4; Ex. 8 at 2:25-3:3; Ex. 9 at 3:3-6; Ex. 10 at 3:2-5; Ex. 11 at 4:2-5; Ex. 12 at 3:6-8; Ex. 13 at 3:10-12; Ex. 14 at 3:4-7; Ex. 15 at 3:11-14; Ex. 16 at 3:4-8; Ex. 17 at 4:22-24; Ex. 18 at 3:5-8; Ex. 19 at 9:25-10:4.

[24]   *See, e.g.*, Ostman Decl., ¶ 39, Ex. 47 at 1-2, Ex. 48 at 1-2, Ex. 49 at 1-2; Reed Decl., Ex. 20 at 15:4-8, 16:1-4; Ex. 21 at 17:12-16.

[25]   *See, e.g.*, Ostman Decl., ¶ 44, Ex. 51 at 2; ¶ 45, Ex. 52 – Ex. 87; ¶ 48, Ex. 88 at 2; ¶ 49, Ex. 89 – Ex. 108; ¶¶ 52-53, Ex. 109 at 1-2; ¶ 54, Ex. 45; ¶ 55, Ex. 110 – Ex. 118; Reed Decl., Ex. 22 – Ex. 23.

[26]   *See, e.g.*, Ostman Decl., ¶ 9; ¶ 15; ¶ 18, Ex. 2 at 1; ¶ 19, Ex. 2 at 2; ¶ 20, Ex. 3 – Ex. 33; ¶ 23, Ex. 34 at 1; ¶ 24, Ex. 34 at 2; ¶ 25, Ex. 35 – Ex. 40; ¶ 32, Ex. 44 at 1; Reed Decl., Ex. 1 at 3:4-5, 8; Ex. 2 at 3:7-8, 11; Ex. 3 at 4:7-10, 12; Ex. 4 at 3:11-13, 17; Ex. 5 at 2:18-20, 22; Ex. 6 at 3:6-9; Ex. 7 at 2:20-22, 25; Ex. 8 at 2:20-22, 24; Ex. 9 at 2:22-24, 3:2; Ex. 10 at 2:22-23, 3:1; Ex. 11 at 3:19-22; Ex. 12 at 3:1-2, 5; Ex. 13 at 3:7-9, 12; Ex. 14 at 2:24-25, 3:3; Ex. 15 at 3:6-7, 10; Ex. 16 at 2:22-25; Ex. 18 at 2:24-25, 3:1, 4; Ex. 19 at 9:25-10:4.

[27]   *See, e.g.*, Ostman Decl., ¶ 39, Ex. 47 at 1, Ex. 48 at 1, Ex. 49 at 1; Reed Decl., Ex. 20 at 15:4-8, 16:1-4; Ex. 21 at 17:12-16.

[28]   *See, e.g.*, Ostman Decl., ¶ 43, Ex. 51 at 1; ¶ 44, Ex. 51 at 2; ¶ 45, Ex. 52 – Ex. 87; ¶ 47, Ex. 88 at 1; ¶ 48, Ex. 88 at 2; ¶ 49, Ex. 89 – Ex. 108; ¶ 52, Ex. 109 at 1; ¶ 55, Ex. 110 – ex. 118; Reed Decl., Ex. 22 – Ex. 23.

[29]   *See, e.g.*, Ostman Decl., ¶ 9; ¶ 15; ¶ 19, Ex. 2 at 1; ¶ 20, Ex. 3 – Ex. 33; ¶ 24, Ex. 34 at 1; ¶ 25, Ex. 35 – Ex. 40; ¶ 26, Ex. 41 – Ex. 42; ¶ 32, Ex. 44 at 1; Knight Decl., ¶ 7, Ex. 2.

Williamson,[30] and Culver[31] where they could find the Company's Terms and Conditions. And other than a single purchase Ballou returned on July 2, 2015[32], and five returns by Culver,[33] neither Ballou,[34] Williamson,[35] nor Culver[36] returned any of their purchases to AMS. Because they did not avail themselves of their opportunity to return the products they purchased to the Company after receiving the full Terms and Conditions, Ballou, Williamson, and Culver are bound by AMS's Terms and Conditions, including the arbitration clause contained therein.

### 2. THIS SPECIFIC DISPUTE IS WITHIN THE SCOPE OF THE PARTIES' AGREEMENTS TO ARBITRATE

If the parties had not delegated the "gateway question" of arbitrability to the arbitrator, this Court's second inquiry would be whether the specific dispute is within the scope of the parties' arbitration agreement. *See Pro Tech*, 377 F.3d at 871 (citing *Bazzle*, 539 U.S. at 452). *See also 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198-99 (8th Cir. 2008) (a court, rather than an arbitrator, will determine whether a particular dispute falls within the scope of an arbitration clause *unless* the parties provide otherwise). Here, AMS's

---

[30]    *See, e.g.*, Ostman Decl., ¶ 39, Ex. 47 at 1, Ex. 48 at 1, Ex. 49 at 1; Reed Decl., Ex. 20 at 15:7-8, 16:3-4; Ex. 21 at 17:15-16.

[31]    *See, e.g.*, Ostman Decl., ¶ 44, Ex. 51 at 1; ¶ 45, Ex. 52 – Ex. 87; ¶ 48, Ex. 88 at 1; ¶ 49, Ex. 89 – Ex. 108; ¶ 52, Ex. 109 at 1; ¶ 55, Ex. 110 – Ex. 118; Reed Decl., Ex. 23 at 6:13-23; Knight Decl., ¶ 9, Ex. 3 – Ex. 4; Knight Decl., ¶¶ 4–7, 13–15.

[32]    Ostman Decl., ¶ 7.

[33]    Ostman Decl., ¶ 41.

[34]    Ostman Decl., ¶ 34.

[35]    Ostman Decl., ¶ 40.

[36]    Ostman Decl., ¶ 61.

Terms and Conditions specified that the parties' disputes would be heard before the AAA, and additionally: (a) as of October 31, 2017, the Company's Terms and Conditions provided that any arbitration between the parties would be governed by the AAA Arbitration Rules, and that the arbitrator would have the exclusive authority to resolve any dispute regarding the enforceability of the arbitration agreement (Ostman Decl., ¶ 30, Ex. 43); and (b) as of January 2019, the Company's Terms and Conditions provided that any arbitration between the parties would be administered by the AAA in accordance with its Consumer Arbitration Rules. (Ostman Decl., ¶ 33, Ex. 45 at 1.) Again, this constitutes a clear and unmistakable intent to delegate the issue of arbitrability to the arbitrator. *Fallo*, 559 F.3d at 878; *FJM Props.*, 756 F.3d at 1100.

But even if the parties had not delegated this issue to the arbitrator, this dispute is within the scope of the arbitration clauses in question and the Court should therefore compel arbitration. A district court is required to send a claim to arbitration when presented with a broad arbitration clause "as long as the underlying factual allegations simply touch matters covered by the arbitration provision." *3M Co.*, 542 F.3d at 1199 (citing *Mitsubishi Motors*, 473 U.S. at 625 n.13). Arbitration clauses covering claims "arising out of" or "relating to" a matter are broad arbitration clauses. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 87 (8th Cir. 2018). "Indeed, such a provision constitutes the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral disputes that relate to the agreement containing the clause." *Id*. (citing *Fleet Tire Serv. Of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997) (quotation marks and alterations omitted). Arbitration clauses covering claims "regarding"

a matter are also considered broad arbitration clauses. *See, e.g., Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 193-94 (1991). Any doubts regarding the scope of arbitrable issues should be resolved in favor of arbitration. *Mitsubishi Motors*, 473 U.S. at 626 (citing *Moses H. Cone*, 460 U.S. at 24-25).

Prior to November 2017, Ballou agreed to arbitrate any dispute regarding any transaction with AMS.[37] Thereafter, Ballou[38] and Williamson[39] agreed to arbitrate any dispute arising out of or relating to any transaction with AMS. The introductory paragraph of Plaintiffs Ballou and Williamson's Class Action Complaint states that Plaintiffs bring their action "on behalf of themselves and all others similar [*sic*] situated who purchased coins from" AMS. (Ballou Compl. at 1.)[40] Similarly, Culver agreed to arbitrate any dispute arising out of or relating to any transaction with AMS.[41] Culver's Class Action Complaint states that he brings the action "on behalf of himself and all others similar [*sic*] situated who purchased coins from" AMS. (Culver Compl. at 1.)[42] It is beyond question that this

---

[37]    *See* Ostman Decl., ¶ 12, Ex. 2 at 2.

[38]    *See* Ostman Decl., ¶ 24, Ex. 34 at 2; ¶ 25, Ex. 35 – Ex. 40; ¶ 30, Ex. 43 at 2; ¶ 33, Ex. 45 at 1.

[39]    *See* Ostman Decl., ¶ 38, Ex. 45 at 1.

[40]    *See also, e.g.*, Ballou Compl., ¶ 52 (alleging that Ballou and Williamson bring their lawsuit on behalf of a national class consisting of all ascertainable persons in the United States who purchased one or more coins from AMS).

[41]    Ostman Decl., ¶ 44, Ex. 51 at 2; ¶ 45, Ex. 52 – Ex. 87; ¶ 48, Ex. 88 at 2; ¶ 49, Ex. 89 – Ex. 108; ¶ 54, Ex. 45 at 1; ¶ 55, Ex. 110 – Ex. 118; ¶ 58, Ex. 119 at 1; ¶ 59, Ex. 119 at 1.

[42]    *See also, e.g.*, Culver Compl., ¶ 49 (alleging that Culver brings his lawsuit on behalf of a national class consisting of all ascertainable persons in the United States who purchased one or more coins from AMS from 2015 to present).

dispute is regarding, arises out of, and/or relates to Plaintiffs' transactions with AMS, and that this dispute therefore falls within the scope of the parties' agreements to arbitrate.

## II. PLAINTIFFS HAVE WAIVED THEIR RIGHT TO PURSUE CLAIMS AGAINST AMS AS PLAINTIFFS OR CLASS MEMBERS IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING

When granting AMS's Motion and compelling the Plaintiffs to submit their claims against the Company to arbitration in accordance with the parties' agreements, the Court should also direct the Plaintiffs to proceed to arbitration in their individual capacities only. The parties' arbitration agreements provide that Plaintiffs could only assert claims against AMS in their individual capacities, not as plaintiffs or class members in any purported class or representative proceeding. (Ostman Decl., ¶ 13, Ex. 2 at 2; ¶ 19, Ex. 2 at 2; ¶ 20, Ex. 3 – Ex. 33; ¶ 24, Ex. 34 at 2; ¶ 25, Ex. 35 – Ex. 40; ¶ 30, Ex. 43 at 2; ¶ 33, Ex. 45 at 1; ¶ 38, Ex. 45 at 1; ¶ 39, Ex. 47 at 1, Ex. 48 at 1, Ex. 49 at 1; ¶ 44, Ex. 51 at 2; ¶ 45, Ex. 52 – Ex. 87; ¶ 48, Ex. 88 at 2; ¶ 49, Ex. 89 – Ex. 108; ¶ 54, Ex. 45 at 1; ¶ 55, Ex. 110 – Ex. 118; ¶ 59, Ex. 119 at 1.) Class action waivers in arbitration agreements are enforceable. *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011) (relying on *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351-52 (2011) (holding the FAA preempted state-law challenge to a class action waiver provision in arbitration agreements between AT&T and its customers). The Plaintiffs have therefore waived their rights to proceed with their claims against AMS in any capacity other than as individuals, and when compelling arbitration of those claims, the Court should direct Plaintiffs to proceed in that fashion in accordance with the parties' agreements.

### III. THE COURT SHOULD STAY THESE PROCEEDINGS PENDING THE OUTCOME OF THE PARTIES' ARBITRATIONS

The FAA requires a district court to stay an action pending an arbitration rather than dismissing it. *SuperShuttle Int'l*, 653 F.3d at 769. *See also* 9 U.S.C. § 3 ("the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]"). The Court should therefore stay this proceeding pending the outcome of the parties' arbitrations.

## <u>CONCLUSION</u>

For the foregoing reasons, AMS respectfully requests that the Court compel Plaintiffs' claims against the Company to individual arbitrations and stay these proceedings pending the outcome of those arbitrations.

Dated: August 13, 2021                    **MADEL PA**


By      */s/ Mack H. Reed*
        Mack H. Reed (398703)
        Stephen M. Premo (393346)
        Cassandra B. Merrick (396372)
        800 Hennepin Avenue
        800 Pence Building
        Minneapolis, MN 55403
        Phone: (612) 605-0630
        Fax: (612) 326-9990
        mreed@madellaw.com
        spremo@madellaw.com
        cmerrick@madellaw.com

        *Attorneys for Defendant Asset Marketing*
        *Services, LLC, d/b/a GovMint.com*